Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh, and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning and please be seated. We'll begin with the United States v. Slager. Ms. Franklin Best. Good morning, Your Honors, and may it please the Court. With this Court's permission, I would like to focus my presentation on Issues 1, 2, and 3 raised in the briefing, and I would like to rely on the briefing submitted as to Issues 4 and 5. But of course, I am prepared to and will happily answer any questions that this Court may have about any of these issues. As to Issue 1, the key issue in this case is what was in the mind of Officer Michael Slager the moment he pulled the trigger of his service weapon and shot Mr. Walter Scott. Respectfully, the overwhelming weight of evidence presented to the District Court points to fear. Fear was in Officer Slager's mind, and if that is true, then the proper cross-reference should be voluntary manslaughter and not second-degree murder. These are the facts that indicate that Officer Slager was deeply fearful when he shot Mr. Scott with his service weapon. These are the facts that were in his mind during his encounter with Mr. Scott. Number one, he knew that he was in a particularly dangerous part of Charleston. This was his beat. He was familiar with the area and its reputation for violence. Two, he knew he was alone with no backup. Three, he knew that this unknown suspect believed it in his best interest to flee rather than receive a written citation for a minor traffic infraction. Well, how is that consistent with being fearful of someone simply trying to run away from you as opposed to attacking you? Well, this is one of the factors. I mean, there's sort of a number of them. This was just part of what was in his mind. No, you brought it up, so why is that relevant? Well, he testified that he believed that he thought that I think it cuts against his being fearful, doesn't it? All due respect, Your Honor, I mean, if he's fleeing for a minor traffic offense, then what else could he possibly be being arrested for? I mean, how does someone become fearful when someone's running away from them? Well, he didn't know if he had a weapon at that point, Your Honor. I mean, he never had an opportunity. He was running away. He was running away, but, you know, in this community, he didn't know what else could be going on with this particular human being, Your Honor. If you see someone who is running away, you have no indication they have a weapon. You think that gives an officer the right to just shoot an individual eight times? No, Your Honor. When he's running away? No, absolutely not. When you're describing this case, I'm wondering, what case are you talking about? Because I'm looking at the facts of this case, and I'm not following you at all. Isn't the issue whether he was provoked, whether he was in fear? One thing you can say, but the question is whether he was provoked. Well, I mean, with all due respect, Your Honor, I mean, when you look at some of these additional factors, Your Honor, I mean, you know, at the time that this happened. Maybe I don't understand these facts. Okay. Because I understand the facts. He stopped him for a broken taillight? He did. Consistent with the policies of Charleston? The individual got out. He missed a run. The officer chased him. Yes. Caught him? Yes. He got an altercation? They got into a ground altercation, yes. He was chased? Yes. How many times? Twice. Twice. And somehow, did he even think there was a gun? Did he see a gun? Did he say there was a gun then? Well, what he knew was that his attempts to bring this suspect under control were not working. He got into a fight. The suspect was being pursued because he had a broken taillight. This dangerous suspect because of this broken taillight. He's so fearful of him. But he chases him twice. The suspect then gets up, runs away. And in the process of running away, the officer shoots at him eight times in the back. Well, Your Honor, there are a couple of points about that. So at the time that he discharged a surface weapon, they had just had this ground provocation. This officer told this story a complete lie as to what happened. Well, I think that that was an eyewitness who happened to have a videotape. That might have been the story. But when he gets up and says, oh, no, he turns around, takes my taser, he comes back and he tries to get me. Well, there's a lot. You can't blame this officer on anything he said. Well, Your Honor, there's a lot to unpack there. I mean, so if I could get back to. . . You can't unpack when this officer blatantly lied. What's there to unpack about that? Well, Your Honor, I mean, when it comes to what the district court characterized as like the evolving narratives that Officer Slaker gave. . . It's not evolving. A video is not an evolving narrative. Well, but the video only caught. . . The testimony is consistent, and the court found this, with every fact that they point out. And it turns out the officer's story is changing, depending on who's interviewing. He doesn't know there's a video. He didn't even ask. He asked if there was a video witness, and they didn't tell him. And then he tells a story that's inconsistent. Your Honor, I mean, first of all, I mean, again, there's a lot to kind of discuss there. I mean, the video did not capture everything. The video captured the point at which the fire started. That would lead to the trier fact as to whether to believe your client's expert or whether to believe Mr. Santana, who is an eyewitness. From 136 feet away. Okay, but what I'm saying is, why isn't this simply a factual matter, and we respect the judgment of the district court to believe Mr. Santana? That was certainly within his prerogative to find Mr. Santana to be credible. With all due respect, Your Honor, I mean, the district court judge did not take into consideration a number of factors that were relevant to the inquiry. What are you saying? He's clearly erroneous? Yes, Your Honor. I mean, it is a legal error not to take into account the factors that were present. That's a steep hill to climb, isn't it? I mean, it is, Your Honor. I mean, certainly there's a deference to the district court judge in this case. But in this case, the judge found that the relevant, the salient facts here were that during this ground altercation, you know, he concluded that Officer Slager did not have the taser in his possession and that Mr. Scott was never on top of Mr. Slager. So, I mean, to begin with, I mean, those were the facts. The district court found that he was face down the whole time and during the altercation and that he never, you say your client was so fearful, but there was a finding of fact that he, that Mr. Scott had not, never punched Mr. Slager and never had possession of the taser. And I don't understand. Okay. I don't understand this fearfulness. Okay. Well, the fearfulness comes from the fact that just prior to these shots being fired, 1.44 seconds before the shots were fired, they were on the ground. If you're a police officer and you are on the ground with a suspect, I mean, one thing is very, very clear. You have lost control of the situation. He had his service weapon on him. He had a taser. And he knew, because he watches the news like we all do, that those weapons could have been used against him. And a moment after they separated, that is when the shots were fired. We talk about the difference between voluntary manslaughter and second-degree murder. If you shoot an unarmed fleeing man in the back, that's got to be a murder. That's not something in the heat of passion. If you're shooting somebody fleeing who's unarmed and he's fleeing and you shoot him in the back, that's not provocation. That's not in the heat of passion. Wasn't it perfectly fair for the district court to say that this belonged on the second-degree murder side of the line? This is not just voluntary manslaughter as I understand it. Your Honor, I mean, respectfully, I disagree. I mean, this, again, was a very heated provocation. The experts that the defense presented that the district court discounted showed that there was really much more of a provocative encounter that occurred on the ground. And then, I mean, again, I go back to the 1.44 seconds. He said he wasn't provoked. Didn't he testify in his trial? I was not provoked. I was not angry. I was just doing my job. He said he was not angry, and that is true. He said that he was deeply fearful. He said he was not provoked. I mean, he said he was not provoked. But in the context in which that arose, I'm sorry, Your Honor. I'm not trying to be argumentative. I just want to know what the record says because I know what the record says. I want to make sure you and I are in agreement on it. Didn't he say, I was not provoked? In the context of, I mean, that's accurate, yes. But if I could clarify. I was angry. He was not angry. He was fearful. Where is the provocation? The provocation is being deeply terrified for his life. You again, his credibility comes in. So here's an instance. We shouldn't believe him when he said that. Yes, Your Honor, and I believe. We shouldn't believe him when he said he wasn't provoked. Well, you should believe him when he says that he was deeply fearful for his life. I mean, and, you know, he was not provoked by anger, but provoked from this existential threat that he was just encountering. He had begun to run away from him, right? Yes. But it was a moment. It was a moment before those bullets. I mean, if he had been, if this were three seconds, five seconds, ten seconds later, I mean, the case would be stronger for malice. But during this incredibly protracted period of time during which there were all of this violent encounter on the ground, I mean, that is not enough to sort of say that he was motivated by malice. You know, this was an officer who, you know, he was not a rogue officer. I mean, by all accounts, he had been a superb officer. And this particular situation is beyond his control. And in a split second, the shots were fired. Anybody else around? Well, I mean, Mr. Santana was around. Well, I'm sorry. He is the one who saw it from a distance of 136 feet. I'm sorry? Was he trying to protect Mr. Santana? I imagine he believed he was protecting anyone who was in that community. He did not know that Mr. Santana was there. He did not. He thought no one was there. That's why he made up that story, was because he said he didn't think there was a witness nor a video. So he couldn't have possibly believed this suspect was endangering somebody else. Well, I mean, again, this was his beat. This was his community. He knew that there were people who were living in this particular area. What are we to make of the fact that he dropped the taser near Mr. Scott? He ultimately picked it up. But doesn't that show some consciousness of guilt here? You know, and that was a fine, I mean, when the judge was asked, when the district court judge was asked to make a finding that that constituted obstruction of justice, I mean, he declined to make that particular finding. Maybe so, but I think you can still factor that into the question of what his intent was, what his malice was, whether it was, in fact, reasonable fear. How do you get around that? You know, I don't know that there are any clear answers on that particular point. I mean, in reading, reviewing the record, I know that they presented much testimony about sort of the problems with memory in the context of these kinds of highly charged environments, situations. And we know that there was memory loss or, you know, Officer Slager sort of said he didn't quite remember exactly what he did with that particular taser. We do know, though, that he picked it up, and I believe he picked it up, you know, very early on to secure his weapon. On the obstruction of justice enhancement, did you even raise that below? You know... The government says we're really up here on plain error review. I think that's probably accurate, Your Honor. I mean, I know that there were, you know, objections to, you know, this was something. They knew that the government was seeking an obstruction and, you know, sort of debated that. I mean, this is not the particular claim that was raised below that is accurate. Is it fair to say that the officer painted a completely false version of what took place and that this required the expenditure of a great amount of resources to eventually ferret out the correct story? Well, I believe that the extent to which there were inconsistencies in the version of facts that Officer Slager gave, I mean, I think that was a very highly contested issue. It was especially contested during the state, you know, proceedings. You know, he mounted a defense. I mean, you know, Officer Slager has consistently said that he did not commit murder. It would not seem to be appropriate to penalize him with an obstruction of justice claim or enhancement because he was defending himself against the state and the government's... Mr. Scott was the aggressor, was just in total contradiction to what the eyewitness testified to and what the district court found. It wasn't a question of an innocent mistake of memory, was it? It was a question of two clashing narratives that really couldn't be reconciled. If one was true, the other was false and vice versa. And I see that my time is out, Your Honor. If I may answer that. I mean, again, I believe that Officer Scott presented what he understood, you know, the events of that day to be given kind of the haze of this very provocative encounter. Somebody is charging you and coming after you and really what eventually emerged was that he was shot in the back. That would suffice for an obstruction enhancement, wouldn't it? Well, you know, I don't because I believe he was not significantly impeded in the investigation of this case. I mean, he was arrested for murder right after this conversation with the SLED agents, which was the first time they had an opportunity to speak with him.  Thank you, Your Honor. Ms. Hecker. Your Honor, this is Elizabeth Hecker for the United States. May it please the Court. Your Honor, I would like to start out by pointing out Mr. Slager's attorney has essentially raised a reasonable fear defense in the Court this morning. And I would like to point out that if Mr. Slager had a reasonable fear that he was in danger, that is a complete defense to the 242 claim. And such claim is entirely inconsistent with his guilty plea in this action. And I would like to point out to Your Honors that Mr. Slager accepted a three-level downward departure here for acceptance of responsibility. His claim now that he was in fear for his life is inconsistent with the guilty plea and with that three-level downward departure. With that said, Your Honors, I would like to just start out by some comments about the underlying offense here. First of all— Did he actually plead guilty to? He pled guilty to a Section 242 claim, and that came along with a factual narrative. The factual narrative essentially encompassed everything that the government has asserted except for what happened during the ground altercation, Your Honor. It encompassed the fact that Mr. Scott was shot eight times, that five of those shots hit him in the backside of his body. Did the factual basis for the plea include the circumstances of the shooting? That he was running away as he was shot, Your Honor? Yes, Your Honor, it does. So the factual basis for the plea included the fact that Mr. Scott was running away from the officer. Yes, Your Honor. And so that narrative changes during sentencing? That narrative changes during—well, Mr. Slager testified in pretrial proceedings that he had—that Mr. Scott had grabbed his taser. He admits at some point after the pretrial proceedings—I don't think he testified at sentencing, but after the guilty plea there were other experts who testified. But what I'm asking you is what's being argued here on appeal is different from the factual basis of the plea? That's absolutely correct, Your Honor, in that he was in fear for his life. But I thought that was the whole—I mean, I thought that was the whole ballgame in the district court, and he made the argument, didn't he, that he was in fear of his life at the district court in an attempt to refute the cross-reference to second-degree murder? That's correct. Your Honor, in the state trial, he was claiming self-defense. So he was saying he was in fear for his life. But I thought I heard you say that what he's saying here today is inconsistent with his plea to a 242 offense. That's correct, Your Honor. Then why did the district court accept the plea? The district court accepted the plea, Your Honor, because I imagine the district court believes Mr. Slager was now accepting responsibility and admitting what happened that day. Well, he needs to admit both the fact, but he needs to admit liability as a matter of law. And you seem to be saying that there was some question as to whether or not the court should have accepted the plea in the first place if he was alleging something entirely inconsistent as a matter of law with that offense. The court accepted the plea, Your Honor, and during the sentencing proceedings, the government actually threatened on a couple of occasions to withdraw its recommendation about the three-level downward departure because it seemed, again, that Mr. Slager was not accepting responsibility for his actions. I'm not sure that all of this has all that much salience. I think that, you know, really what we come down to is what the district court found at the sentencing hearing. And it comes down to me, the fact that he credited Mr. Santana, who is an eyewitness, that said he was shot in the back. And if that was the case, it undermines any kind of fearfulness or provocation defense, and it's something that's not in the heat of passion. So I think it's actually pretty straightforward, isn't it? The government agrees, Your Honor. We know from Mr. Santana's video that Mr. Slager killed Walter Scott by shooting him repeatedly at his back as he ran away. The district court found that during the ground altercation that immediately preceded the shooting, Mr. Scott was never on top of Mr. Slager, never assaulted Mr. Slager, and never tried to get Mr. Slager's taser. And these are facts that Mr. Slager claims lead to a heat of passion mitigation. It's a question here of basically the standard of review and whether the district court was clearly erroneous in the findings that he made. That's correct, Your Honor. And the district court, these findings, again, are, as you say, are reviewed for clear error. And the district court certainly did not commit clear error by believing Mr. Santana. I'm sorry, Your Honor? He was very careful in the way he went about the hearing. We believe so, Your Honor. We believe so. As the facts played out in this case, Mr. Scott was unarmed at the time. Is that right? That's correct. But, of course, the officer didn't know that. So how do we factor that into this in determining the reasonableness of his fear? Your Honor, Mr. Slager never has even claimed that he saw Mr. Scott with a weapon. He's never claimed he saw a gun. He's never claimed he saw a knife. He's never claimed he saw any sort of weapon. He certainly never claimed that Mr. Scott had a weapon and showed it to him, threatened him with it. Of course, your colleague on the other side began her presentation with the suggestion that this was a high-crime, high-violence area of the city. And I suppose one could argue that, in that circumstance, a police officer might be on heightened alert with respect to weapons. We would agree that that would give Mr. Slager permission to, for instance, conduct a Terry stop, to search Mr. Scott, to search his car if he were being arrested. And I'm not sure a broken taillight is even grounds for arrest here. But Tennessee v. Garner, your Honor, is clear that unless the officer has a reasonable belief that the defendant has a weapon, has seen something that looks like a weapon, something like that, then it is absolutely unreasonable for him to use deadly force in shooting a fleeing suspect. That's a troubling determination that because it's a high-crime area or an area where crime occurs, citizens who live in those areas can be shot in the back as they're running away because they're in a high-crime area. But if you lived in a neighborhood that was not so, and you're running away, there's no reason, or at least less reason than often, to be fearful. And it's a troubling result if we go there, given the fact that, you know, I would think that many citizens who live in areas like that, if they economically could move or go other places, they probably would. But it doesn't mean decent citizens don't live there. And when you confront someone, whether they are running or whatever it is, it just doesn't seem to me that the standard should be different for shooting someone in the back because they happen to live somewhere that's not so desirable. Certainly, Your Honor. And the Supreme Court has squarely held that in no circumstance, unless the officer has a reasonable belief the defendant has a weapon, is a danger to the officer or to others, is it reasonable to shoot someone in the back. The court has held that being in a dangerous neighborhood or fleeing from an officer can form a reasonable suspicion, for instance, for a stop and frisk. But no court in the Supreme Court has actually held the complete opposite as far as using deadly force. It is crystal clear from Supreme Court precedent that it is an unlawful seizure to use deadly force on a fleeing suspect who they have no reasonable belief to be armed. Your Honor, I would like to just point out that the Supreme Court has said that, except for extreme circumstances, not an issue in this case. A district court's determinations as to credibility can virtually never be clear error. And that certainly is the case here. Mr. Santana's story, as Your Honors have pointed out, was consistent throughout from the beginning of this investigation through the federal proceedings here. Moreover, these facts support the district court's finding of malice. This court repeatedly has said that malice is conduct that is reckless and wanton and a gross deviation from a reasonable standard of care of such a nature that warrants an inference that the defendant was aware of a serious risk of death or bodily harm. Your Honors, there can be no question that shooting at a man eight times as he is running away, hitting him five times from behind, meets this standard. And the district court also correctly found that there was no heat of passion here. Courts have held that this requires some extreme provocation beyond what a reasonable person could be expected to withstand, severely impairing the capacity for self-control in this situation. These facts, as found by the district court, simply do not rise to this level. And Officer Slager has admitted in his guilty plea that his actions here were unreasonable under the circumstances. Your Honors, I can move on to obstruction of justice if you have any questions. Is there anything that we in our own questions have not covered? I don't believe so, Your Honor. I would just note that... You don't have to use all your time. Yes, Your Honor. I would just note, again, that in the application notes, the application notes, they apply to attempts. The fact that our opposing counsel here has admitted this review is for plain error, I think assists us here. This was certainly not plain error. It's not clear under current law in this court that it does not apply to attempts under these circumstances. All right, thank you. Unless the court has any further questions, we would just ask that the court affirm Mr. Slager's conviction and sentence. Do you have any more questions? Thank you. We have no further questions. Thank you. Ms. Franklin Best, you have some rebuttal time. Thank you, Your Honors. And if I could just sort of go back to something that Judge Wynn inquired about. Just to be perfectly clear, you know, the fact that this was a high crime area, we are not arguing, provided any justification, for shooting Mr. Scott. I mean, we accept that this was a bad shooting, and that is why Officer Slager eventually pleaded guilty to that. Now, as part of the plea agreement, though, they left the sentencing as to whether or not the cross-reference should be second-degree murder or voluntary manslaughter open. It was. It was. And that plea agreement, you know, expresses that Walter Scott was running away at the time that the shots happened, you know, the time that he was shot. And we accept that. He accepted that at the time of his guilty plea. So in arguing that. . usions Farey .
judges: J. Harvie Wilkinson III, James A. Wynn Jr., Albert Diaz